[Cite as *State v. Gray*, 2016-Ohio-1419.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                    :
                                                 :
    *Plaintiff-Appellee/Cross-*       :        Appellate Case No. 26139
    *Appellant*                       :
                                                 :        Trial Court Case No. 2012-CR-1589/2
v.                                               :
                                                 :        (Criminal Appeal from
MITCHELL D. GRAY, JR.                            :        Common Pleas Court)
                                                 :
    *Defendant-Appellant/Cross-*     :
    *Appellee*

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of April, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee/Cross-Appellant

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 1210 Talbott Tower, 131 North Ludlow Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Mitchell Gray, appeals from his conviction on charges of Murder (Felonious Assault); Felonious Assault (Deadly Weapon); Felonious Assault (Serious Physical Harm); Aggravated Burglary (Deadly Weapon); and Aggravated Robbery (Deadly Weapon), all with firearm specifications. In support of his appeal, Gray contends that the jury verdict was against the manifest weight of the evidence and that that evidence was insufficient, as a matter of law, to prove his guilt beyond a reasonable doubt. Gray also contends that the trial court erred in ruling that statements Gray made while in custody at the hospital and Safety Building could be admitted.

{¶ 2} The State was granted permission to file a cross-appeal. In a sole assignment of error, the State argues that the trial court erred in granting Gray's Crim.R. 29 motion for acquittal on the following charges: Murder (proximate result of Aggravated Burglary); Murder (proximate result of Aggravated Robbery); Aggravated Burglary (Physical Harm); and Aggravated Robbery (Serious Physical Harm).

{¶ 3} We conclude that Gray's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. We further conclude that the State's assignment of error has merit. The trial court incorrectly granted Gray's Crim.R. 29(A) motion for acquittal on Murder (proximate result of Aggravated Robbery); Aggravated Burglary (Physical Harm), and Aggravated Robbery (Serious Physical Harm), and Murder (proximate result of Aggravated Burglary). However, any error could not affect the judgment, since the State is not permitted to appeal judgments of acquittal. Accordingly, the judgment of the trial court will be affirmed.

{¶ 4} As an additional matter, we note that during oral argument, the State raised and conceded error in the termination entry, based on *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659. Accordingly, this matter will be remanded to the trial court for correction of clerical error in the termination entry, which failed to incorporate the findings mandated by R.C. 2929.14(C)(4), for imposing consecutive sentences.

## I. Facts and Course of Proceedings

{¶ 5} The charges against Gray arose from his alleged involvement in the death of Robert Munday, which occurred in the early morning hours of May 21, 2012. At the time, Munday lived at 4421 Genesee Avenue, in Dayton, Ohio. Munday had lived in the neighborhood for some time, and had been good friends with a woman named Linda Kay, who had lived on Genesee Avenue since she was about six or seven years old.

{¶ 6} It was common knowledge among people who knew Munday that he sold drugs out of his home. According to Munday's girlfriend, Tara H., Munday sold cocaine to a regular group of 10 people who came to his house every day, and he made at least $2,000 a day. Munday kept the cocaine in a green jewelry box that sat on the counter in the kitchen next to the sink. If Munday did not spend the money he earned, he would dump the contents of his pockets into the top drawer of the dresser in his bedroom, and the money would be loose in the drawer. Eventually, Tara began counting the money and banding it together. She wrapped the money in rubber bands, with one thousand in each band, and then put two of the banded amounts of money together.

{¶ 7} Tara last saw Munday on Friday, May 18, 2012, when she left for the weekend. That afternoon, Tara banded the money in the drawer, and counted over

$6,000.

**{¶ 8}** As was noted, Munday and Linda were close friends, and Linda usually visited Munday two or three times a week. At one point, Linda had even stayed at Munday's house. She did not live there, but Munday allowed her to sleep there. Around Christmas time 2011, Munday loaned Linda $1,200. At about the same time, he also sold Linda a revolver. At some point, Munday gave Linda a second revolver, and lent her more money. Linda never repaid the money. Munday kept two or three other guns at his home, including a small gun that he either kept in his pocket or under a green China cabinet in the kitchen, and a revolver that he kept in the chest of drawers in his bedroom.

**{¶ 9}** Linda sold marijuana and was never employed. She also gambled. A few weeks before Munday's death, Linda and her girlfriend, Amy R., were at Hollywood Casino in Lawrenceburg, Indiana. On that occasion, Linda lost all her money, which amounted to thousands of dollars. Amy had also grown up on Genesee Avenue, and had known Linda most of her life. Amy and Linda became romantically involved about two years before May 2012, and they had moved into an apartment together a few months before Munday's death.

**{¶ 10}** Gary G. lived across the street from Munday and had known Munday since he was a kid. Gary and Munday were good friends. On Sunday night, May 20, 2012, Gary, and his friend, Jeff, arrived home around 11:15 p.m. When Gary came home, Munday was outside, on the porch of Munday's next-door neighbor, Ron. Gary and Jeff went across the street, and the four men sat on the porch, socializing. Gary also knew Linda, as he had grown up with her, too. In addition, Gary was familiar with Linda's car, which was a white Buick Regal.

{¶ 11} Gary was aware that Munday had lent Linda money and that she had not paid him back.  At around midnight, Linda's car pulled up and was parked across the street from Munday's house.  According to Gary, Munday was expecting to see Linda that night so that Linda could pay him back some money.  Linda was in the car with a man that Gary had never seen before.  He described the man (later identified as Mitchell Gray) as being about his own size, and having a little Afro.  Munday left the porch and walked over to meet them.  Munday shook both their hands and said, "What's up" to Gray.  Munday, Linda, and Gray then walked up Munday's driveway and went in the back door of the house.  Munday's front door was never used, as it was hard to close; people normally entered through the back.  When Munday went into the house, Gary, Ron, and Jeff continued to sit on the porch, talking and joking.

{¶ 12} About five to ten minutes later, Gary heard arguing inside the house.  He could not make out the words.  The first thing he recalled clearly hearing was Munday saying, "What the f*ck."  January 7, 2014 Transcript of Proceedings, p. 236.  Gary heard a scuffle inside the house, and recalled hearing Munday screaming in pain at the first shot.  Gary heard more yelling, and heard Munday saying something like, "Come on, man." *Id*. at 238.  Then, a second shot went off.  At that point, Gary went between the two houses, into Ron's backyard.  Ron grabbed his young daughter, who was on the porch, and went into his own house.  By the time Gary got to the back yard, a third shot had gone off.  The three shots were heard within a pretty short period of time.

{¶ 13} From where Gary stood, he was able to see Munday's back door, back porch, and the back yard.  For a few seconds, Gary did not see anyone.  Then, Linda came out.  Her back was to him, and she was looking into the house for a few seconds.

Gray then came out of the house. According to Gary, he next saw Munday's friend, Chuck, walking up the driveway. Gray pulled a pistol out in front of Chuck's face, and told Chuck to keep it moving. Chuck ran back down the driveway. Linda took off in a jog, like she was in a hurry. Gary did not see anything in Linda's hands, but she was running like she had something under her coat. Gray then came down the driveway, noticeably limping, got in Linda's car, and they left. Gary did not see Linda with a gun.

{¶ 14} Chuck also testified at trial. He indicated that he had been friends with Munday for about six months and had visited him several times to play video games. On the night of May 20, 2012, Chuck called Munday and asked if he could come over to play a video game entitled "Call to Duty." After Chuck's friend, Josh, got off work, the two men drove to Munday's house and parked in the driveway. As Chuck pulled in, he saw a woman (Linda) walking from the backyard. Josh was having trouble finding his cigarettes, so Chuck got out of the car and told Josh to come in when he found his cigarettes.

{¶ 15} As Chuck walked up the driveway, he passed Linda and they actually brushed shoulders. He asked her how she was doing, but she did not respond. As Chuck continued to walk up the driveway, he noticed smoke coming out of the back door. He also saw a male (Gray) step out of the back door and aim a handgun at his (Chuck's) head. The male actually bounced the gun off Chuck's head, and said, "You better start running, white boy, or I'll kill you, too." January 7, 2014 Transcript of Proceedings, p. 341.

{¶ 16} Chuck was panicked and frantic. He turned and ran immediately back to his car. Josh was just getting out, and he told him to get back in, that something was

wrong.

{¶ 17} Josh also testified, and stated that he noticed a woman (Linda) walking to the side of Chuck's car. As soon as this happened, Chuck came hustling back to the car. Chuck seemed frightened and his demeanor had changed drastically. Chuck said they had to get out of there, that some guy had just put a gun to his head and told him to "get out of here, fat boy, or I'll put a bullet in your head." *Id.* at p. 382.

{¶ 18} Chuck got the car started, but it stalled when he tried to back it out of the driveway. Both Chuck and Josh testified that Gray was pointing the gun at them as they were trying to leave. Chuck testified that Gray had been shot and was limping, that he saw a wound to Gray's knee or leg region, and that blood was gushing out. In addition, Josh testified that Gray was grabbing his leg and was obviously limping. According to Chuck, the woman got out of a white vehicle that was parked across the street and helped Gray get into the car. Chuck drove in the opposite direction, away from the white car. Ultimately, Josh identified Gray from a photo lineup. However, neither Chuck nor Josh gave statements to the police for a number of weeks.

{¶ 19} In the meantime, Gary had entered the house, where he found Munday in the kitchen, which was the first room inside the back door. Munday was dead. According to the coroner, Munday sustained two gunshot wounds: one was to the hip area and could potentially have been survived. The other was a head wound that would have caused unconsciousness within a matter of seconds and death within minutes. The coroner was unable to tell which wound occurred first, but found it more likely that the hip shot was first.

{¶ 20} The police arrived on the scene prior to 1:00 a.m. An evidence technician

placed placards starting from the street, going back to the house. There was a trail of blood going up the driveway and onto the back porch. Blood was also found in the kitchen, in the hallway leading to the bedrooms, but not in the master bedroom where Munday's money was kept. The police took samples of the blood as evidence, including three samples from carpet in the living room and hallway. They also found a gun in the kitchen under a kitchen cabinet. The gun was a .25 caliber automatic, with the magazine partially ejected. Four rounds were in the magazine, and one cartridge was inside the chamber. They also found a .357 Magnum revolver with six live cartridges in a drawer in the master bedroom. In addition, the police found $548 in a drawer in a dresser in the master bedroom and $132 on the floor in the master bedroom. However, the $6,000 plus that Tara had banded up and placed in the drawer was gone.

{¶ 21} Despite a thorough search, the police were not able to find any bullet fragments or shell casings in the kitchen. The bullet that caused Munday's head wound was recovered from his body and was determined to have been fired from either a .38 special or a .357 Magnum caliber firearm. It could not have been fired from the .25 handgun found in the kitchen.

{¶ 22} Amy, Linda's girlfriend, received a phone call from Linda around 1:20 or 1:30 a.m. on May 21, 2012. After the call, Linda's mother, Sonya, came to the apartment, picked Amy up, and drove her to Hollywood Casino in Lawrenceburg. Amy brought with her changes of clothing and toiletries for herself and Linda. When they arrived at the casino at around 4:00 a.m., Linda's car was in the parking garage. Sonya subsequently followed Linda to a cement entry to what Amy thought was the Ohio River. Once they arrived, Linda put her car in neutral and ran it into the river. The last time Amy saw the

car, it was floating in the river. Linda brought a black backpack with her from the car. Subsequently, Sonya dropped Linda and Amy off at a Red Roof Inn. Although Sonya was supposed to come back, she never did.

{¶ 23} Linda gave Amy cash to check into the hotel. While at the hotel, Linda cut her hair to change her appearance. The two women did not go to sleep; instead, they took a cab to yet another hotel, where Linda again gave Amy cash to check in. They then took a cab to Walmart, where Linda paid cash for luggage and a laptop computer. On May 22, 2012, Linda bought a Grand Am automobile from Craigslist, spending $1,500 in cash. She titled the car in Amy's name. Linda also gave Amy $500 in cash. It was unusual for Linda to have this type of cash.

{¶ 24} On May 23, 2012, Amy and Linda returned to their apartment complex. Amy dropped Linda off at the leasing office, but the police were there, and Linda was arrested. Subsequently, in June 2012, Amy discovered $1,500 in cash that Linda had apparently hidden in Amy's bottle of conditioner. Amy returned all the cash and the car to the police.

{¶ 25} Meanwhile, back at the crime scene, the police interviewed some witnesses. In light of the information from witnesses and the blood trail, the police advised dispatch to alert the homicide squad if a shooting report came in. About 4:00 a.m. (a few hours after the shooting), the squad was notified that a shooting victim had come into Miami Valley Hospital. As a result, Dayton homicide detectives Rasor and Gaier went to Miami Valley Hospital to investigate. Upon arriving, they spoke with Gray's family members and learned that Gray had been taken to the hospital in his aunt's Ford Expedition automobile, which was parked outside the emergency room entrance. After

Rasor and Gaier obtained the aunt's written consent to search the vehicle, an evidence technician took photos and obtained a blood sample from blood that was in the vehicle. Nothing else was recovered.

{¶ 26} After speaking with Gray's family, Rasor and Gaier interviewed Gray, who was lying in a bed in one of the emergency rooms. The officers introduced themselves and said they were there to talk about his shooting. Gray had a bloody bandage along his right thigh, where he had been shot and appeared to be cognizant of his surroundings, although he was in pain. The officers obtained Gray's vital information and asked him to tell them what had happened. Gray stated that he had been on Kammer Avenue, near Westwood Avenue, and was walking towards James H. McGee Boulevard. He said a dark car with tinted windows approached him, and a person in the car asked his name. The person also asked if Gray had drugs. For no reason at all, someone in the car then shot him and sped off.

{¶ 27} Gray told the police that he called his family and then came directly to the hospital. He could not provide any suspect information or the license plate number of the car. The interview lasted around 10 minutes, and the police did not attempt to question him further. Detective Rasor indicated that at the time, Gray was being treated as a shooting victim.

{¶ 28} Ultimately, the police re-interviewed Gray later that morning, at the Safety Building.[1]  Before the interview was conducted, Gray was informed of his *Miranda* rights

---

[1] At a suppression hearing, Detective Gaier indicated that when he returned to the Safety Building, he discovered that Gray had outstanding warrants for his arrest. He was not aware of the pending warrants when the police went to the hospital, because the police were not yet aware of the shooting victim's identity. Due to the outstanding warrants, the police called the hospital and instructed security to have Gray brought to

and consented to speak with the police. The interview was also recorded. At the time of the interview, the police told Gray that they had found no evidence of a shooting at Kammer and Westwood Avenues. However, this was false, as the police had not yet been to that location. Later that day, after the interview, Rasor and another officer did go to the location where Gray said he had been shot. The officers conducted a thorough search of a five-block area and were unable to find any evidence that a shooting had occurred.

{¶ 29} An analysis of representative blood samples found inside and outside the house, including blood found on the driveway and on carpet samples inside the house, indicated that Gray was the source of the DNA found in these samples. A forensic scientist from the Miami Valley Regional Crime Lab testified that one would expect to see this particular DNA profile once in three septillion times in the general population, and that the population of the earth was only currently 7.2 billion.

{¶ 30} In December 2012, Gray was indicted on nine counts (labeled as Counts 11-19 in the indictment), including three counts of Murder; two counts of Aggravated Burglary; two counts of Aggravated Robbery; and two counts of Felonious Assault. In February 2013, Gray filed motions to suppress any evidence obtained as a result of statements Gray made at the hospital or at Dayton Police headquarters; any evidence obtained based on pretrial identification of Gray; and any evidence based on a warrantless seizure of DNA evidence from Gray on May 21, 2012. After an evidentiary hearing, the court overruled the motions to suppress the statements and identification evidence. In addition, the court overruled in part and sustained in part the motion to

the Safety Building when the hospital released him.

suppress evidence obtained as a result of search and seizure. The court held that Gray did not consent to the swabbing of his mouth on May 21, 2012. However, the court found that the results of a second DNA swabbing, obtained after a search warrant issued on January 25, 2013, would be admissible.

{¶ 31} A jury trial was held in January 2014. At the conclusion of the State's case, the trial court granted a Crim.R. 29(A) motion to dismiss Counts 11 and 12 (two counts of Murder based, respectively, on Aggravated Burglary and Aggravated Robbery); and Counts 14 and 17, based, respectively, on Aggravated Burglary (Physical Harm) and Aggravated Robbery (Serious Physical Harm). The jury found Gray guilty of the remaining charges.

{¶ 32} After merging the Murder and two Felonious Assault convictions and merging the five firearm specifications, the trial court sentenced Gray to a total of 27 years to life in prison, with the sentence to be served consecutively with sentences imposed in Montgomery County Common Pleas Court Case Nos. 2011-CR-2582 and 2011-CR-3867. The total sentence for all three cases was 36 years to life.

{¶ 33} Gray now appeals from his conviction and sentence. As was noted, the State also requested, and was given, leave to cross-appeal the decision granting Gray's Crim.R. 29(A) motion for acquittal.

## II. Manifest Weight and Sufficiency

{¶ 34} Gray's First Assignment of Error states that:

The Jury Verdict Was Against the Manifest Weight of the Evidence,

and the Evidence Presented Was Insufficient, as a Matter of Law, to Prove

the Appellant's Guilt Beyond a Reasonable Doubt.

## A. Sufficiency of the Evidence

{¶ 35} Under this assignment of error, Gray first contends that the State failed to present sufficient evidence to sustain a guilty verdict on any of the charges. The crux of Gray's argument is that a reasonable juror could not conclude beyond a reasonable doubt whether Linda or Gray committed the crimes, and that no evidence was presented to show that Gray aided and abetted Linda in the commission of the offenses. In this regard, Gray focuses on the fact that Linda was the one who had a motive to commit crimes and gained financially, while Gray was simply shot in the leg.

{¶ 36} "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9.

{¶ 37} The fact that Linda spent large sums of cash after the murder does not mean that Gray was not involved in the murder, nor does it necessarily mean that he failed to obtain any proceeds of a theft. A reasonable juror could conclude that, unlike Linda, Gray was injured and had to seek medical treatment. Gray, therefore, had no opportunity to spend any money. Gray was also arrested the day of the crime. Notably, Gray did not come to the hospital for about three hours after the crime, and he could have disposed of money prior to his arrival.

{¶ 38} Furthermore, the State was not required to prove Gray's motive for shooting Munday. *See State v. Curry*, 43 Ohio St.2d 66, 70-71, 330 N.E.2d 720 (1975) (noting that the State need not prove motive to obtain a conviction). The State also did not have to prove that Gray shot Munday for any particular reason. In Count 13 (renumbered Count Three at trial), Gray was accused of having caused Munday's death as a proximate result of committing Felonious Assault, a violation of R.C. 2903.11, contrary to R.C. 2903.02(B). R.C. 2903.02(B) provides that:

{¶ 39} No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

{¶ 40} The trial court instructed the jury as follows:

> The offense of violence Mr. Gray must have attempted or attempted to commit is felonious assault deadly weapon. Felonious assault deadly weapon is committed when the defendant knowingly causes physical harm to another person, Robert Munday, by means of a deadly weapon.

January 10, 2014 Transcript of Proceedings, p. 874. The court's instruction was consistent with R.C. 2903.11(A)(2), which deals with Felonious Assault. Specifically, R.C. 2903.11 provides that "(A) No person shall knowingly do either of the following: * * * (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 41} In *State v. Anderson*, 10th Dist. Franklin No. 10AP-302, 2010-Ohio-5561, the court noted that "felonious assault under R.C. 2903.11(A), combined with the definition of 'knowingly' found in R.C. 2901.22(B), does not require that a defendant intend to cause 'serious physical harm,' but that the defendant acts with an awareness that the conduct probably will cause such harm." (Citation omitted.) *Id.* at ¶ 13. In *Anderson*, the defendant was convicted of felonious assault after having stabbed a man who was sitting outside on the front steps of an apartment building. The defendant apparently became angry at a woman who had rebuffed him, and stabbed the victim as he got up to go into the building. *Id.* at ¶ 3-5.

{¶ 42} On appeal, the defendant argued that his conviction was not supported by sufficient evidence because, among other things, the victim provided no motive for the stabbing. *Id.* at ¶ 14. The court of appeals rejected this argument, commenting that the prosecution did not have to prove motive. *Id.* In addition, the court observed that it did not weigh credibility when considering insufficiency arguments. *Id.*

{¶ 43} We agree with these observations. In the case before us, there could have been a number of reasons why Gray shot Munday. Accordingly, the Murder and Felonious Assault convictions (Counts 13, 18, and 19, renumbered as Three, Eight, and Nine) were supported by sufficient evidence.

{¶ 44} Gray was also convicted of Aggravated Burglary (Deadly Weapon)(Count 15, renumbered as Count Five). In connection with this count, the indictment charged that Gray:

by force, stealth or deception, did trespass in an occupied structure, to-wit: **a residence located at 4421 Genesee Avenue, Dayton, Ohio** or in a separately secured or separately occupied portion of the structure, when another person, other than an accomplice of the offender, was present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure, any criminal offense, to wit: **Theft**, and did have a deadly weapon or dangerous ordnance, to wit: **handgun** on or about his person or under his control; contrary to the form of the statute (in violation of Section 2911.11(A)(2) of the Ohio Revised Code) * * *.

(Bolding sic). Doc. #1, p. 3.

{¶ 45} R.C. 2911.11(A)(2) provides that:

No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

* * *

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

**{¶ 46}** Although Munday originally gave Gray permission to be in the home, Gray's privilege to remain there "terminated the moment he commenced his assault." *State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987). In *Steffen*, the court stressed that:

From that undisputed fact [that the defendant did not deny striking the victim repeatedly before killing her], a powerful inference arises that appellant was no longer privileged to remain in [the victim's] home, and that he knew his privilege had been terminated. In our view, this inference is so strong that it excludes the possibility of drawing from the same facts any other reasonable inference supporting a theory of innocence.

*Id.*

**{¶ 47}** The same result occurred in *State v. Morton*, 147 Ohio App.3d 43, 2002-Ohio-813, 768 N.E.2d 730 (8th Dist.), in which the court held that the assault of the victim terminated the defendant's permission to be on the premises. *Id.* at ¶ 51. In *Morton*, the court further held that "[t]he subsequent assault constituted the underlying felony element of the crime of aggravated burglary." *Id.*

**{¶ 48}** In contrast to *Morton* and *Steffen*, the underlying felony element of the crime of Aggravated Burglary in Count 15 is theft, not assault. In outlining the elements of theft, R.C. 2913.02 states, in pertinent part, that:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give

consent * * *.

**{¶ 49}** In the case before us, there was no evidence that Gray stole the money from the bedroom. His blood was not found in the bedroom. However, Gray's blood was found in the living room and in the hallway outside the bedroom where the money was located. A reasonable inference from these facts is that Gray was aware, after his permission to be on the premises had terminated, that a theft had been committed. More importantly, Gray did not need to be the principal offender in order to be found guilty of the crime. *See, e.g.*, R.C. 2923.03(A)(2); R.C. 2923.03(F); *State v. Williams*, 2d Dist. Montgomery No. 7833, 1982 WL 3820, *1 (Oct. 12, 1982); and *State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 19-20.

**{¶ 50}** R.C. 2923.03(A)(2) provides that: "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * [a]id or abet another in committing the offense." The Supreme Court of Ohio has stressed that " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " (Citation omitted.) *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001). However, " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " (Emphasis added.) *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

**{¶ 51}** Thus, "to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may

be inferred from the circumstances surrounding the crime." *Johnson* at 245.

{¶ 52} After the theft was committed, Gray assisted or supported Linda by displaying a weapon and threatening others who happened on the scene. He also left with Linda, fleeing the scene of the crime. Accordingly, " 'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime [of Aggravated Burglary] proven beyond a reasonable doubt.' " *Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, at ¶ 9, quoting *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus.

{¶ 53} Finally, Gray was convicted of Aggravated Robbery (Deadly Weapon) (Count 16, renumbered as Count Six). The indictment alleged in connection with this count that Gray:

> in attempting or committing a theft offense as defined in Section 2913.01(K)
>
> of the Revised Code, or in fleeing immediately after the attempt or offense,
>
> did have a deadly weapon, to-wit: **handgun**, on or about his person or under
>
> his control and did display the weapon, brandish the weapon, indicate
>
> possession of the weapon or use the weapon; contrary to the form of the
>
> statute (in violation of Section 2911.01(A)(1) of the Ohio Revised Code) * *
>
> *.

(Bolding sic.) Doc. #1, p.3.

{¶ 54} R.C. 2911.01(A)(1) provides that: "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either

display the weapon, brandish it, indicate that the offender possesses it, or use it * * *."

**{¶ 55}** For the reasons previously expressed in connection with the discussion of Aggravated Burglary, the conviction of Aggravated Robbery was also supported by sufficient evidence. Again, Gray was not required to be the principal offender; he was merely required to aid and abet Linda. He did so by displaying a weapon while they both fled from the scene. Accordingly, all of the convictions were supported by sufficient evidence.

## B.   Manifest Weight of the Evidence

**{¶ 56}** In arguing that the convictions were against the manifest weight of the evidence, Gray focuses on the fact that the three State witnesses who observed Gray with a gun did not mention that fact until days after the incident, and that there were some variations in testimony about what Gray allegedly said when he pointed the gun at Chuck.

**{¶ 57}** "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered .' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 58}** In the case before use, there were no direct witnesses to the murder. However, this is not at all unusual, and significant circumstantial evidence linked Gray to the murder and felonious assaults.

**{¶ 59}** "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus. The Supreme Court of Ohio has also stressed that "[i]t is * * * well-settled under Ohio law that a defendant may be convicted solely on the basis of circumstantial evidence." (Citations omitted.) *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). In addition, "we have noted that circumstantial evidence is often more persuasive than direct evidence." *State v. Wood*, 2d Dist. Montgomery No. 26134, 2016-Ohio-143, ¶ 38, citing *State v. Reed*, 155 Ohio App.3d 435, 2003-Ohio-6536, 801 N.E.2d 862, ¶ 56 (2d Dist.). *See also State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991) (observing that "direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence.")

**{¶ 60}** The testimony at trial indicated that Gray and Linda entered Munday's home, and within several minutes, an argument or scuffle ensued. After the first shot occurred, Munday was heard to say "Come on, man." While this comment did not necessarily have to refer to a male, the phrase is more likely to refer to a person of that gender. In addition, one would have expected Munday to use Linda's name if she were the shooter, since they were close friends. More importantly, no one saw Linda with a gun. Instead, the three witnesses who observed Gray leaving the house saw Gray with a gun. Since Gray and Linda left the house shortly after the third shot, it would be illogical

to assume that Linda was the shooter and handed the gun off to someone else.

{¶ 61} Furthermore, one of the witnesses (Chuck) testified that Gray pointed the gun at his head and told him to leave or he would shoot him, too. This was an admission on Gray's part of his actions, and the trier of fact was permitted to believe this testimony. "In conducting our review of the evidence, 'we are guided by the presumption that the jury, or the trial court in a bench trial, "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *State v. Booker*, 10th Dist. Franklin No. 15AP-42, 2015-Ohio-5118, ¶ 16, quoting *State v. Cattledge*, 10th Dist. Franklin No. 10AP-105, 2010-Ohio-4953, ¶ 6, which in turn quotes *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 62} We also accord little weight to the failure of witnesses to mention the gun the night of the crime. As an initial matter, Gary G. was a very close friend of Munday and is the one who first found Munday dead. Gary was so distraught that he went outside, "lost it," hit and punched his own car, and broke his hand in the process. He also broke his cell phone. Gary stated that he did not remember giving a statement to the police that night and that he did not have much to say at the time, other than giving the police Linda's name. In this regard, Gary stressed that Linda was the only person he knew, and that is who was on his mind that night. However, when Gary spoke to Detective Gaier a few days later, he did mention seeing the gun.

{¶ 63} The other two witnesses, Chuck and Josh, did not immediately come forward. After speaking to Gary and another neighbor, Detective Gaier learned about Chuck, and was able to track him down. Gaier first spoke to Chuck a few days after the

crime, but Chuck was out of town on a previously planned vacation, and arranged to talk to the police after he returned. Gaier found out about Josh from Chuck, and Josh was interviewed by the police on June 4, 2012. As a result, there were legitimate reasons for the delay.

{¶ 64} When Chuck and Josh were interviewed, they both mentioned that Gray had a gun and that he had threatened Chuck with the gun. As a result, the witnesses did not fail to mention the gun; they simply were not interviewed at the time of the crime. Notably, Gray was in custody as a suspect for the murder on the day of the crime, and Linda was arrested by May 23, 2012. The police, therefore, would have had no reason to rush their investigation.

{¶ 65} There were minor discrepancies between the testimony of Gary, Chuck, and Josh about what Gray said when he brandished the gun. Gary said that the man pulled the gun out in front of Chuck's face and told him to keep moving. Chuck testified that Gray "bounced" the gun off his head and said, "You better start running, white boy, or I'll kill you, too." January 6, 2014 Transcript of Proceedings, p. 341. Josh did not hear what was said, but reported that Chuck told him when he returned to the car that Gray said "get out of here, fat boy, or I'll put a bullet in your head." *Id.* at p. 382.

{¶ 66} "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." (Citation omitted.) *State v. Anderson*, 10th Dist. Franklin No. 10AP-302, 2010-Ohio-5561, ¶ 12. These witnesses were confronted with highly frightening circumstances, and it would not be unusual for minor differences in recollection to occur. However, even if we assume that Gray did not make a direct admission to having killed Munday, the convictions were not against the

manifest weight of the evidence. We have stressed that " 'the jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony.' " *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 36, quoting *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.).

**{¶ 67}** Accordingly, Gray's convictions were not against the manifest weight of the evidence.

**{¶ 68}** Based on the preceding discussion, the First Assignment of Error is overruled.

### III. Admissibility of Gray's Statements

**{¶ 69}** Gray's Second Assignment of Error states that:

The Trial Court Committed Reversible Error When It Ruled Admissible the Statements that Appellant Made While in Custody at the Hospital and the Safety Building.

**{¶ 70}** Under this assignment of error, Gray contends that the trial court erred in finding that statements Gray made at the hospital and when interviewed at police headquarters could be admitted into evidence. This argument is based on the trial testimony of Detective Rasor, who indicated that Gray was a suspect when the police interviewed him at the hospital. This testimony contrasted with prior testimony of Detective Gaier, who testified at the suppression hearing that when Gray was interviewed at the hospital, he was being interviewed only as a crime victim, not as a suspect.

**{¶ 71}** At trial, the court overruled Gray's renewed motion to suppress. January

8, 2014 Transcript of Proceedings, pp. 681-682. The court concluded that even if Gray were a suspect at the time of the hospital interview, a reasonable person would not have concluded that his freedom of movement was restrained to the degree associated with a formal arrest. *Id.* at p. 682.

**{¶ 72}** In *State v. Estepp*, 2d Dist. Montgomery No. 16279, 1997 WL 736501 (Nov. 26, 1997), we noted that "in reviewing decisions on motions to suppress, an appellate court reviews the record to see if substantial evidence exists to support the trial court's ruling, bearing in mind that the trial court has the function of assessing credibility and weighing evidence." *Id.* at *2, citing *State v. Brown*, 91 Ohio App.3d 427, 429-30, 632 N.E.2d 970 (6th Dist.1993). We also observed that "in the particular area of custodial interrogations, the United States Supreme Court has said that whether a suspect is in custody is a mixed question of fact and law entitled to independent review." (Citations omitted.) *Id.*

**{¶ 73}** "Police are not required to administer *Miranda* warnings to everyone whom they question." (Citation omitted.) *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). Moreover, the requirement of warnings is not imposed " 'simply because * * * the questioned person is one whom the police suspect.' " *Id.*, quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). "Only *custodial* interrogation triggers the need for *Miranda* warnings." (Emphasis sic.) *Id.* "The determination whether a custodial interrogation has occurred requires an inquiry into 'how a reasonable man in the suspect's position would have understood his situation.' " *Id.*, quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). " '[T]he ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom

of movement" of the degree associated with a formal arrest.' " *Id.*, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

**{¶ 74}** "In reaching this determination, neither the subjective intent of the officer, nor the subjective belief of the defendant is relevant." (Citations omitted.) *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 50 (2d Dist.). "Instead, we have considered factors such as the location of the interview and the defendant's reason for being there, whether the defendant was a suspect, whether the defendant was handcuffed or told he was under arrest or whether his freedom to leave was restricted in any other way, whether there were threats or intimidation, whether the police verbally dominated the interrogation or tricked or coerced the confession, and the presence of neutral parties." *Id.*, citing *Estepp* at *4.

**{¶ 75}** In the case before us, the only factor that really weighs in Gray's favor is that he was a suspect at the time he was interviewed. The rest of the factors indicate that no formal restraint or restriction of freedom occurred, and that *Miranda* warnings were not required. Specifically, the interview took place in a hospital emergency treatment room, where Gray had voluntarily taken himself for treatment; the police did not take Gray there, nor did they restrain him during questioning. Any restriction of Gray's movement was not due to the police, but was due to the need for medical treatment. *Compare State v. Pyle*, 2d Dist. Greene No. 2003-CA-35, 2003-Ohio-6664, ¶ 23 (holding that the defendant was not in custody at the hospital because his freedom was restricted by his need for treatment, not because the police deprived him of freedom of movement).

**{¶ 76}** Furthermore, Gray was not handcuffed or arrested. The police also did not make any threats nor did they intimidate Gray; the interview was quite brief, during which

the police merely asked Gray how he had been injured, and he provided them with minimal details about having been shot by unknown assailants on Kammer Avenue.

{¶ 77} Subsequently, when Gray was actually in custody at the Safety Building, *Miranda* rights were administered, as they should have been at that point, and Gray consented to additional questioning by the police.

{¶ 78} Based on the preceding discussion, the trial court did not err in overruling the motion to suppress Gray's statements. Accordingly, Gray's Second Assignment of Error is overruled.

IV. The Court's Crim.R. 29 Ruling

{¶ 79} As was noted, the State has been given permission to file a cross-appeal. The State's sole cross-assignment of error is that:

> The Trial Court Erred When the Court Sustained Gray's Crim.R. 29 Motion for Acquittal as to the Offenses of Murder (Proximate Result of Committing or Attempting to Commit Aggravated Burglary – Deadly Weapon), Murder (Proximate Result of Committing or Attempting to Commit Aggravated Robbery – Deadly Weapon), Aggravated Burglary (Physical Harm), and Aggravated Robbery (Serious Physical Harm) Because the Court Did Not Apply the Correct Substantive Law to the Facts of the Matter.

{¶ 80} In granting Gray's Crim. R. 29 motion for acquittal, the trial court focused on the lack of evidence that Gray had the intent to commit or attempt to commit a theft offense, or to aid Linda in attempting to commit a theft offense, when Gray inflicted serious harm on Munday or shot and killed Munday. The State contends that the court erred by

ignoring relevant case law, which indicates that robbers cannot avoid the effect of the felony murder rule by first killing their victims and then robbing them.

{¶ 81} In its motion for leave to appeal, the State conceded that it is not appealing the acquittal, and that the judgment of acquittal cannot be disturbed. We agree. *See, e.g., State v. Keeton*, 18 Ohio St.3d 379, 481 N.E.2d 629 (1985), and *State v. Bistricky*, 51 Ohio St.3d 157, 160, 555 N.E.2d 644 (1990) (holding that "a court of appeals has discretionary authority pursuant to R.C. 2945.67(A) to decide whether to review substantive law rulings made in a criminal case which results in a judgment of acquittal so long as the verdict itself is not appealed.")

{¶ 82} Crim.R. 29(A) states that:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

{¶ 83} Rulings on Crim.R. 29 motions are reviewed under the same standards that apply to review for sufficiency of the evidence. *State v. Baker*, 2d Dist. Greene No. 2009 CA 62, 2010-Ohio-2633, ¶ 16. As was noted above, the proper inquiry is whether, " 'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, at ¶ 9, quoting *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus.

{¶ 84} In *State v. Williams*, 74 Ohio St.3d 569, 660 N.E.2d 724 (1996), the

defendant and an accomplice killed a man and then the defendant raped or attempted to rape the man's wife, who survived the attack. *Id.* at 571. The defendant was subsequently charged with three counts of aggravated murder, including death penalty specifications, and was found guilty. *Id.* at 571-572.

{¶ 85} On appeal, the court of appeals held that the trial court erred during the death penalty stage. Specifically, the trial court submitted to the jury the aggravating circumstance that the defendant had committed aggravated murder while attempting to commit rape. *State v. Williams*, 11th Dist. Trumbull No. 89-T-4210, 1995 WL 237092, *47 (Mar. 24, 1995). In this regard, the court of appeals held there was "simply no evidence to reasonably support the inference that appellant had formed an intent to rape Katherine Melnick at the time of his assault on George Melnick." *Id.* at *49. Despite finding this error, the court of appeals concluded that any error would be cured by its independent review. *Id.*

{¶ 86} On the cross-appeal of the State, the Supreme Court of Ohio did not agree that the trial court erred in submitting the aggravating circumstances to the jury. In this regard, the Supreme Court of Ohio first discussed its prior interpretation of R.C. 2903.01(B). This statute states that:

> No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

**{¶ 87}** The Supreme Court of Ohio noted that:

This court has had occasion to explain the meaning of the word "while" with respect to R.C. 2903.01(B), stating:

" 'The term "while" does not indicate * * * that the killing must occur at the same instant as the attempted rape, or that the killing must have been caused by the attempt, but, rather, indicates that the killing must be directly associated with the attempted rape as part of one continuous occurrence * * * .' * * * The evidence here showed that the murders were associated with the kidnappings, robbery, and rapes 'as part of one continuous occurrence.' " *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903, quoting *State v. Cooper* (1977), 52 Ohio St.2d 163, 179-180, 6 O.O.3d 377, 386, 370 N.E.2d 725, 736.

*Williams*, 74 Ohio St.3d at 577, 660 N.E.2d 724.

**{¶ 88}** The court went on to hold that:

In this case, the murder of Mr. Melnick was "associated" with the attempted rape of Mrs. Melnick "as part of one continuous occurrence." As such, this case satisfies the *Cooey* test. The facts are even stronger than those in [*State v.*] *Rojas*, [64 Ohio St.3d 131, 592 N.E.2d 1376 (1992)] and [*State v.*] *Smith*, [61 Ohio St.3d 284, 574 N.E.2d 510 (1991)], in which death sentences were affirmed, because there is no evidence which suggests a substantial passage of time between the assault on Mr. Melnick and the attempted rape of Mrs. Melnick. Thus, we find that neither the felony-murder statute nor Ohio case law requires the intent to commit a felony to

precede the murder in order to find a defendant guilty of a felony-murder specification. In doing so, we reject the court of appeals' interpretation of R.C. 2903.01(B) and 2929.04(A)(7).

*Williams* at 577-78.

**{¶ 89}** The Supreme Court has ruled similarly in other cases. *See, e.g.*, *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 55-56 (aggravated murder, robbery, and rape); *State v. Palmer*, 80 Ohio St.3d 543, 571, 687 N.E.2d 685 (1997) (aggravated murder and aggravated robbery); *Biros*, 78 Ohio St.3d at 450, 678 N.E.2d 891 (aggravated murder and aggravated robbery).

**{¶ 90}** Ohio has been described as having followed the minority view with respect to the felony-murder doctrine. *See Nay v. State*, 123 Nev. 326, 332, and fn. 22, 167 P.3d 430 (2007). In *Nay*, the Supreme Court of Nevada adopted "the majority rule that the felony-murder doctrine requires that the actor must intend to commit the predicate enumerated felony before or at the time the killing occurred." *Id.* at 436.

**{¶ 91}** The statute relied on in *Williams, Johnson*, *Palmer*, and *Biros* [R.C. 2903.01(B)], differs from the statute involved in the case before us. The indictments against Gray were based on R.C. 2903.02(B), not R.C. 2903.01(B). See Doc. #1, pp. 1-2, Counts 11 and 12, which were renumbered as Counts One and Two, respectively, and dismissed pursuant to Crim.R. 29(A).

**{¶ 92}** Count 11 states that Gray caused Munday's death as a proximate result of Gray's "committing or attempting to commit an offense of violence, to wit: Aggravated Burglary, in violation of 2911.11 * * * ; in violation of Section 2903.02(B) of the Ohio Revised Code." Doc. #1, p.1. Count 12 states that Gray caused Munday's death as a

proximate result of Gray's "committing or attempting to commit an offense of violence, to wit:  Aggravated Robbery in violation of 2911.01 * * *; in violation of Section 2903.02(B) of the Ohio Revised Code."  Doc. #1, pp. 1-2.

{¶ 93} R.C. 2903.02(B) provides that:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

{¶ 94} The language in R.C. 2903.02(B) differs from R.C. 2903.01(B), and requires that death be *proximately caused* by the offender attempting to commit an offense of violence that is a felony of the first or second degree.   (Emphasis added.)

{¶ 95} We have held that "commission of another felony offense is a necessary predicate to an R.C. 2903.02(B) offense, and the predicate felony must be a proximate cause of the death R.C. 2903.02(B) prohibits."  *State v. Cook*, 2010-Ohio-6222, 970 N.E.2d 1020, ¶ 49 (2d Dist.), citing *State v. Reid*, 2d Dist. Montgomery No. 23409, 2010-Ohio-1686.  *Accord State v. Scandrick*, 2d Dist. Montgomery No. 23406, 2010-Ohio-2270, ¶ 56; *State v. Harwell*, 2d Dist. Montgomery No. 25852, 2015-Ohio-2966, ¶ 78.

{¶ 96} " 'A proximate cause of any given result is that cause which in the natural and continued sequence of events contributes to produce the result, and without which it would not have happened.' "  *Reid* at ¶ 38, quoting *Monnin v. Fifth Third Bank of Miami Valley,* 103 Ohio App.3d 213, 224, 658 N.E.2d 1140 (2d Dist. 1995).

{¶ 97} As was noted, Count 11 of the indictment alleges that the violent felony underlying the murder charge is Aggravated Burglary, in violation of R.C. 2911.11.   This

statute provides that:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 98} Count 12 of the Indictment indicates that the violent felony pertaining to the murder charge is Aggravated Robbery, in violation of R.C. 2911.01. This statute provides that:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 99} The trial court also granted Crim.R. 29 acquittals on Count 14 (renumbered as Count Four), which alleges theft as the basis for the Aggravated Burglary charge in violation of R.C. 2911.11(A)(1); and Count 17 (renumbered as Count Seven), which alleges theft as the basis for the Aggravated Robbery charge in violation of R.C. 2911.01(A)(3). See Doc. #1, pp. 2 and 4. Both of these charges indicate that while committing the crimes, Gray attempted to inflict physical harm (Count 14) and serious physical harm (Count 17) on Munday.

{¶ 100} In granting the Crim.R. 29(A) acquittals, the trial court reasoned that there was no evidence that Gray had the purpose, either as a principal, or as an aider and abettor, to commit a theft offense. In this regard, the court focused on the following facts: (1) there was no evidence to indicate whether the disagreement that preceded the shooting was theft as opposed to Linda's failure to repay the debt; (2) the DNA trail of Gray's blood was contained in the entrance to the bedroom, but not in the bedroom, where the stolen property was located; (3) no stolen property was recovered from Gray; (4) even though a splash of Gray's blood was found on a canister on the kitchen floor that contained money, there was no evidence that Gray had handled the canister, and no evidence that anything was missing from the canister; and (5) there was no evidence that the act of theft occurred before the shooting. January 9, 2014 Transcript of Proceedings, pp. 787-788, 793-795, 797, 807-808, 811, 812, 818-819, and 855-856.

{¶ 101} Nonetheless, we disagree with the trial court regarding its findings on the theft issue and its relationship to the proximate cause of the murder. The trial court astutely focused on potential weaknesses in the State's case. However, those factual issues should have been resolved by the jury.

{¶ 102} The Crim.R. 29 standard of review, the law pertaining to complicity, and the ample circumstantial evidence of Gray's continuous participation in the occurrence involving the multiple crimes and murder, satisfied the State's burden at that stage of the proceeding to show that the death was proximately caused by the commission or the attempt to commit the theft offense under R.C. 2903.02(B). When construing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found sufficient evidence that Gray aided and abetted Linda in the theft and that the theft was a proximate cause of the murder. As a result, the trial court incorrectly granted the motion for acquittal with respect to Count 12, and Counts 14 and 17, which were all based on theft.

{¶ 103} We also disagree with the trial court's ruling with respect to Count 11, which was based on Aggravated Burglary, but for additional reasons. Unlike the other charges upon which Gray was acquitted, this charge was not based on theft, either in terms of the indictment or the bill of particulars that the State filed. See Doc. #79, filed on December 24, 2013 [indicating that the murder charge in Count 11 was based on Aggravated Burglary in violation of R.C. 2911.11(A)(2)].

{¶ 104} According to the evidence, Gray initially had permission to be on the premises. However, as we mentioned earlier, the privilege ended when Gray began his assault on Munday, and he then became a trespasser, through force. *Steffen*, 31 Ohio St.3d at 115, 509 N.E.2d 383; *Morton*, 147 Ohio App.3d 43, 2002-Ohio-813, 768 N.E.2d 730, at ¶ 50. *Accord State v. Casey*, 2d Dist. Miami No. 19940, 2004-Ohio-1017, ¶ 26 (holding that even if a defendant had permission to be in the victim's apartment, the privilege to remain ended when the defendant commenced his assault).

**{¶ 105}** In *Morton*, the court of appeals observed that once the defendant's permission to be on the premises was revoked, "[t]he subsequent assault constituted the underlying felony element of the crime of aggravated burglary." *Id.* at ¶ 51. Likewise, Gray's subsequent assault on Munday provided the underlying felony element of Aggravated Burglary, and was also the proximate cause of Munday's death, which satisfies the proximate cause requirements of R.C. 2903.02(B).

**{¶ 106}** Accordingly, the State's sole assignment of error has merit, even though it does not affect the acquittal.

**{¶ 107}** Based on the preceding discussion, the State's cross-assignment of error is sustained. As noted, this has no effect on the judgment, which will be affirmed.

**{¶ 108}** As a final matter, we note that, during oral argument, the State raised the issue of an error in the trial court's termination entry, based on *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, which requires that "[i]n order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *Id.* at syllabus.

**{¶ 109}** At the sentencing hearing, the trial court made findings regarding consecutive sentences and determined that the sentences for the Aggravated Burglary and Aggravated Robbery convictions were to be served consecutive to the sentence imposed for Murder. In addition, the court concluded that the sentence in this case (Montgomery County Common Pleas Court Case No. 2012-CR-1589/2) would run consecutive to sentences imposed in Montgomery County Common Pleas Case Nos. 2011-CR-2582 and 2011-CR-3867. January 10, 2014 Transcript of Proceedings, pp.

1006-1009.   However, the court did not incorporate the statutory findings for consecutive sentences into the sentencing entry, as required by *Bonnell*.   *Id.* at ¶ 30.

**{¶ 110}** The State conceded this error at oral argument, even though it was not raised by Gray.   In *Bonnell*, the Supreme Court of Ohio stated that "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court."   *Id.*   "Accordingly, the failure to incorporate the findings, made at the sentencing hearing, into the sentencing entry, is not a basis for reversal of the judgment."   *State v. Leet*, 2d Dist. Montgomery No. 26696, 2016-Ohio-138, ¶ 18, citing *State v. Snowden*, 2d Dist. Montgomery No. 26329, 2015-Ohio-1049, ¶ 13, and 18.

**{¶ 111}** This matter will be remanded so that the trial court can issue a nunc pro tunc entry correcting its clerical mistake.


V.   Conclusion

**{¶ 112}** All of Gray's assignments of error having been overruled, and the State's cross-assignment of error having been sustained, but without any effect on the judgment, the judgment of the trial court is affirmed.   This case is remanded to the trial court for nunc pro tunc correction of the clerical error in the termination entry.

. . . . . . . . . . . . .

DONOVAN, P.J. and FAIN, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Michele D. Phipps
Jeffrey T. Gramza
Hon. Dennis J. Langer