[Cite as *State v. Robinson*, 2019-Ohio-2943.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28103 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-2654 |
| | : | |
| KENDRICK ROBINSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 19th day of July, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

CHARLES W. SLICER III, Atty. Reg. No. 0059927, 426 Patterson Road, Kettering, Ohio 45419
       Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Kendrick Robinson, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of two counts of felonious assault.   In support of his appeal, Robinson contends that the trial court erred in allowing hearsay testimony under the excited utterance exception to the hearsay rule. Robinson also contends that his trial counsel provided ineffective assistance by failing to object to various matters during his trial and by failing to disclose certain evidence to the State.   Robinson further contends that his conviction for both counts of felonious assault was not supported by sufficient evidence.   For the reasons outlined below, Robinson's conviction will be affirmed.

## Facts and Course of Proceedings

{¶ 2} On September 1, 2016, Robinson was indicted for two counts of kidnapping in violation of R.C. 2905.01(A)(3) and (A)(4), one count of rape in violation of R.C. 2907.02(A)(2), two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), and one count of aggravated menacing in violation of R.C. 2903.21(A).   Except for aggravated menacing, each of the charges included a repeat violent offender specification.

{¶ 3} Robinson's charges stemmed from a physical altercation with his girlfriend, L.D.   It was alleged that on the night of August 21, 2016, Robinson tied up L.D., severely beat her, raped her with a hammer, poked her body with a knife, poured bleach in her mouth, and burnt her with lit cigarettes.   It was also alleged that Robinson threatened the mother of his children, E.C., by telling her that he would cut her throat, their children's

throats, and her mother's throat if she did not stay out of the bedroom where he was assaulting L.D. Robinson pled not guilty to the charges and the matter proceeded to a jury trial.

{¶ 4} During trial, L.D. testified that she was living at Daybreak, a Dayton youth homeless shelter, at the time the altercation with Robinson took place. Testimony provided by L.D., Robinson, and Officer Byron Branch of the Dayton Police Department indicated that an earlier altercation broke out in the Daybreak parking lot while Robinson was there to pick up L.D. During this altercation, several Daybreak residents began harassing Robinson and throwing items at his car. Officer Branch testified that he arrived at the scene and made contact with Robinson, who he later learned was the victim. Branch testified that he documented the event and thereafter permitted Robinson and L.D. to leave the scene together. Branch testified that his interactions at Daybreak were captured by his cruiser camera.

{¶ 5} A second Dayton police officer, Robert Christoffers, also responded to the scene at Daybreak. Officer Christoffers testified that he investigated the matter and spoke to the Daybreak security guard. According to Christoffers, the security guard advised him that Robinson had been set up to be "jumped" by the Daybreak residents. Robinson also testified at trial and indicated that the security guard had advised him that L.D. was the one who set him up.

{¶ 6} Approximately four hours after the incident at Daybreak, Officer Branch and Officer William Overholtz responded to a residence on Warner Avenue on an assault call. When the officers arrived at the scene, they discovered L.D. lying in a bedroom severely beaten. Officer Overholtz testified that L.D.'s face was black and blue and extremely

swollen. Overholtz also observed bruises, cuts, and red marks everywhere on L.D.'s body. Overholtz testified that L.D. was scared and crying when he approached her at the residence. Overholtz claimed that L.D.'s lips were quivering and that she was so upset she could barely speak. The only thing L.D. was able to tell Overholtz at the residence was "my boyfriend did it, my boyfriend did it." Trans. p. 244. Overholtz testified that he was unable to get any other information from L.D. until he met with her at the hospital approximately one and a half hours later.

{¶ 7} Continuing, Overholtz testified that when he arrived at the hospital, L.D. was still upset and crying. Although Overholtz testified that he was eventually able to calm L.D. down enough to speak with her, he testified that L.D. began crying and quivering again as they discussed the altercation with Robinson. Over defense counsel's objection, the trial court permitted the State to elicit hearsay testimony from Overholtz as to what L.D. told him had happened during the altercation. The testimony was permitted under the excited utterance exception to the hearsay rule in Evid.R. 803(2).

{¶ 8} Thereafter, Overholtz testified that L.D. said Robinson stuck the handle of a hammer in her anal cavity and vagina. Overholtz also testified that L.D. said Robinson "hog-tied" her and then picked her up and threw her on the ground while she was defenseless. Overholtz also recalled L.D. telling him that Robinson had tied a towel in her mouth with wire and then poured bleach on the towel and into her mouth. Overholtz further testified that L.D. said Robinson burnt her ears with lit cigarettes, poured beer on her face, and punched and kicked her. Overholtz next testified that L.D. said Robinson used a knife to poke her vagina and nose and told her to sit on the knife while he was holding it up to his groin. Overholtz also recalled L.D. telling him that Robinson walked

her over to a mirror and told her to tell herself that she looked beautiful.

{¶ 9} Despite being severely beaten by Robinson, L.D. professed her continuing love for Robinson at trial and was declared a hostile witness by the State. L.D. testified that Robinson never raped her and also denied Robinson ever poured bleach into her mouth or burned her with cigarettes. L.D. did, however, testify that Robinson hit her repeatedly on the face and all over her body. L.D. also testified that Robinson stuck a rag in her mouth and used electronic cords to tie her wrists and ankles.

{¶ 10} In addition, L.D. testified that Robinson beat her and threw her to the ground while she was restrained. L.D. further recalled Robinson stomping on her face with his foot, choking her with his hands, and pouring beer on her face. L.D. also testified that Robinson touched parts of her body with a knife and made her stand in front of a mirror and tell herself that she looked pretty. L.D. claimed that the physical altercation with Robinson continued on and off for a period of two hours.

{¶ 11} In his defense, Robinson admitted to smacking and punching L.D. in the face, but claimed that he was acting in self-defense. Robinson testified that just prior to the altercation, he and L.D. had engaged in consensual sexual activity during which Robinson tied L.D. up with electrical cords and inserted a hammer into her anal cavity. Although L.D. denied ever having drugs, Robinson testified that the physical altercation started after L.D. became mad at him for flushing her drugs down the toilet. After he flushed L.D.'s drugs down the toilet, Robinson claimed that L.D. angrily jumped on him and hit him multiple times. To defend himself, Robinson testified that he threw L.D. on the bed, smacked her, and punched her twice in the face. In doing so, Robinson admitted to using "a little unnecessary force." Trans. p. 502.

{¶ 12} Robinson also testified that he never threatened the mother of his children, E.C, who lived with him on Warner Avenue. E.C., however, testified that when she came home from work on the night in question, Robinson grabbed her face, told her that L.D. tried to get him jumped, and threatened to cut her throat, their children's throats, and her mother's throat if she went into the bedroom where he was assaulting L.D.

{¶ 13} To contradict Robinson's claim that he was acting in self-defense, the State presented a recording of a jail-house telephone call between Robinson and E.C. wherein Robinson explained why he beat L.D. During this call, Robinson can be heard telling E.C. that he became so angry about L.D. setting him up to be jumped, that he wanted to let L.D. know what it was like to get jumped. On another jail-house call with L.D., Robinson can also be heard telling L.D. not to cooperate with the State and instructing L.D. not to appear at the grand jury proceedings.

{¶ 14} Following deliberations, the jury found Robinson guilty of both felonious assault charges. However, the jury found Robinson not guilty of aggravated menacing and was unable to reach a verdict on the charges of kidnapping and rape. Because the jury could not reach a verdict on those charges, the trial court declared a mistrial as to the kidnapping and rape charges. The trial court then sentenced Robinson to serve eight years in prison for each count of felonious assault and ten years in prison for the repeat violent offender specification. The trial court ordered the sentences to be served consecutively for a total prison term of 26 years.

{¶ 15} Robinson now appeals from his conviction, raising three assignments of error for review. For ease of discussion, we will address Robinson's assignments of error out of order.

## Second Assignment of Error

{¶ 16} Under his second assignment of error, Robinson contends that the trial court erred in allowing hearsay testimony under the excited utterance exception in Evid.R. 803(2). Specifically, Robinson claims that the trial court should have prohibited Officer Overholtz from testifying to statements made by L.D. at the hospital describing the beating she received from Robinson. According to Robinson, the only statement that qualified as an excited utterance was L.D. blurting out "my boyfriend did it, my boyfriend did it" when Overholtz first approached her at the scene. Robinson contends that the excited utterance exception should not have applied to the subsequent statements L.D. made to Overholtz at the hospital. We disagree.

{¶ 17} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay statements are generally inadmissible. Evid.R. 802. However, Evid.R. 803 sets forth certain exceptions allowing for the admission of hearsay. One of those exceptions is an "excited utterance." Evid.R. 803(2).

{¶ 18} An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* "For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event." *State v.*

*Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 69, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993); *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166.

**{¶ 19}** "The [excited utterance] exception derives its guaranty of trustworthiness from the fact the declarant is under such a state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated." (Citation omitted.) *State v. Harr*, 158 Ohio App.3d 704, 2004-Ohio-5771, 821 N.E.2d 1058, ¶ 121 (2d Dist.).

**{¶ 20}** While the passage of time between the statement and the startling event is relevant to determining whether the statement is an exited utterance, it is not dispositive of the issue. *State v. Hopkins*, 2d Dist. Montgomery No. 27131, 2018-Ohio-1864, ¶ 37, citing *Taylor* at 303. "An excited utterance need not be strictly contemporaneous with the startling event." *Id.*, citing *State v. Duncan*, 53 Ohio St.2d 215, 220, 373 N.E.2d 1234 (1978). "Even when the statement is made after a substantial lapse of time, it may be admitted under the excited-utterance exception." *In re S.H.W.*, 2d Dist. Greene No. D44918, 2016-Ohio-841, ¶ 23, citing *Taylor* at 303-304. *See, e.g., State v. Wallace*, 37 Ohio St.3d 87, 90-91, 524 N.E.2d 466 (1988) (affirming admission of statements as an excited utterance even though there was a 15-hour interval between the startling occurrence and the utterance).

**{¶ 21}** In order to be admissible under the excited utterance exception, "the statement must be made while the declarant is still under stress from the event." *Hopkins* at ¶ 37, citing *State v. Ducey*, 10th Dist. Franklin No. 03AP-944, 2004-Ohio-3833, ¶ 22. When determining whether the declarant was still under stress from the event, "each case

must be decided on its own circumstances[.]" *Duncan* at 219. " 'Relevant factors in ascertaining whether the declarant was in a sufficient state of excitement or stress include outward indicia of [the declarant's] emotional state such as tone of voice, accompanying actions, and general demeanor.' " *Ducey* at ¶ 22, quoting *Osborne v. Kroger Co.*, 10th Dist. Franklin No. 02AP-1422, 2003-Ohio-4368, ¶ 46.

{¶ 22} "We review a trial court's ruling on the admissibility of an alleged excited utterance for an abuse of discretion." *Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, at ¶ 70, citing *State v. Helney*, 2d Dist. Montgomery No. 20789, 2005-Ohio-6142, ¶ 22. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Therefore, this court may not disturb the trial court's decision to admit hearsay testimony under the excited utterance exception if the decision was reasonable. *Abner* at ¶ 70.

{¶ 23} As previously noted, Robinson contends that the trial court erred in applying the excited utterance exception to Officer Overholtz's testimony discussing the statements L.D. made to him at the hospital. Overholtz testified that he spoke with L.D. at the hospital approximately one and half hours after he first approached her at the scene. Despite this lapse of time, Overholtz testified that he "could definitely tell that [L.D.] was still upset about the whole incident." Trans. p. 254. Specifically, Overholtz

testified that L.D. was crying, shaking, and her lips were quivering.  *Id.*  Overholtz also testified that L.D. appeared aggravated and scared.  *Id.* at 254-255.

**{¶ 24}** Although Overholtz testified that L.D. was calm at the beginning of his interview with her, Overholtz claimed that L.D. became upset again as he questioned her about the incident with Robinson.  During this time, Overholtz testified that L.D. continued to cry and quiver while they were discussing the incident.  Based on this testimony, the trial court found that L.D. became re-excited by the incident with Robinson. Given such re-excitement, the trial court held that, under the excited utterance hearsay exception, Overholtz could testify to L.D.'s statements about the incident while she was re-excited at the hospital.  Upon review, we find that such a decision was reasonable and not an abuse of discretion.

**{¶ 25}** Robinson, however, argues that the record does not establish that the statements Overholtz testified to were made during the timeframe of L.D.'s re-excitement. Specifically, Robinson contends that the necessary timeframe was not established when the State simply asked Overholtz if there was "[a]nything else that you recall [L.D.] telling you?"  *Id.* at 264.  According to Robinson, that question was not confined to the period of L.D.'s re-excitement.   We disagree.

**{¶ 26}** Before the trial court permitted Overholtz to testify about L.D.'s statements at the hospital, the trial court specifically instructed the State to develop a timeframe for the period of L.D.'s re-excitement.  In following the trial court's instruction, the State asked Overholtz: "When you're at the hospital with [L.D.] and you're trying to speak with her about what happened, were there times when her demeanor became excited?" Trans. p. 262.  Overholtz responded in the affirmative and the State thereafter asked:

"[C]ould you tell us what [L.D.] said to you during those times?" *Id.*

{¶ 27} When responding to the State's question, Overholtz testified that L.D. told him Robinson stuck the handle of a hammer in her anal cavity and vagina. Then, as a follow-up question, the State asked Overholtz "what else do you recall [L.D.] saying?" *Id.* In response, Overholtz testified that L.D. told him Robinson hog-tied her and took her to a mirror and told her to tell herself that she looked beautiful.

{¶ 28} After clarifying what the term "hog-tied" meant, the State followed-up again and asked Overholtz if there was "[a]nything else that you recall [L.D.] telling you?" *Id.* at 264. Overholtz again responded affirmatively and testified that L.D. told him Robinson tied a towel in her mouth and poured bleach in her mouth. Overholtz also testified that L.D. told him Robinson burnt her ears with lit cigarettes, beat her, punched her in the face, threw her down while she was hog-tied, and kicked her in the face.

{¶ 29} Following that testimony, the State followed-up again and asked if there was "anything else you recall [L.D.] telling you?" *Id.* at 264. Overholtz then testified: "I remember her saying that [Robinson] walked over to a chair, used a knife, held the knife up next to his groins [sic] and said come sit on it. Also, poked her in the vagina with the knife; also in the nose, poked her in the nose with the knife; poured beer all over her face. That's what I remember at this point." *Id.* at 264-265.

{¶ 30} When considering the context of the record as a whole, we find that each of the State's follow-up questions related back to the initial question: "[C]ould you tell us what [L.D.] said to you during those times [of excitement]?" *Id.* at 262. We also note that Robinson did not object to the follow-up questions or to Overholtz's responses and therefore waived all but plain error for appeal. *State v. Jones*, 2d Dist. Clark No. 2018-

CA-63, 2019-Ohio-303, ¶ 18, citing *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986).

**{¶ 31}** "In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights." (Citations omitted.) *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22. "Plain error should be noticed 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶ 32}** Here, after reviewing the record, we do not find any error, let alone plain error, in applying the excited utterance hearsay exception to the testimony elicited from the State's follow-up questions. As previously noted, when considering the context of the record as a whole, the follow-up questions related back to the State's initial question asking Overholtz what L.D. said about the incident while she was in a re-excited state at the hospital. Under these circumstances, we find no merit to Robinson's claim that the excited utterance exception should not have applied to the testimony at issue.

**{¶ 33}** Even if it had been erroneous for the trial court to permit Overholtz to answer the State's follow-up questions, we find that Robinson suffered no resulting prejudice. This is because, other than the testimony about the bleach and cigarettes, L.D. gave substantially similar testimony about the incident at trial. Therefore, this case does not present a manifest miscarriage of justice warranting the reversal of Robinson's conviction.

**{¶ 34}** Robinson's second assignment of error is overruled.

**First Assignment of Error**

{¶ 35} Under his first assignment of error, Robinson contends that his trial counsel provided ineffective assistance by failing to object to various matters during his trial and by failing to disclose certain evidence to the State.   We again disagree.

{¶ 36} In order to succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him.   *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.   To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation.   *Strickland* at 688; *Bradley* at 142.   In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."   *Strickland* at 689.

{¶ 37} To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."   *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus.   " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "   *Bradley* at 142, quoting *Strickland* at 694.   The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel.   *Strickland* at 697.

{¶ 38} In claiming that he received ineffective assistance of counsel, Robinson first

contends that his trial counsel was ineffective in failing to object when the State asked Officer Branch about the cruiser camera video footage that was taken during the incident at Daybreak. The question at issue was asked after Branch testified that the video footage was disclosed to the parties. To confirm Branch's testimony that the video footage was disclosed, the State asked: "Because we actually were at a different hearing where you were asked questions about the video right?" Trans. p. 225. Robinson claims his trial counsel should have objected to this question because it referenced hearsay and "may have [led] the jury to believe there were hearings outside the realm of what was being presented." We find no merit to Robinson's claim.

{¶ 39} As previously noted, " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Here, the record indicates that the question at issue did not elicit any out of court statements nor was it asked to prove the truth of the matter asserted, i.e., that other hearings had taken place. Rather, the purpose of the question was to confirm the fact that the video footage had been disclosed to the parties. As a result, the question did not elicit any hearsay statements from Officer Branch. It is also unclear how objecting to the question would have affected the outcome of trial, as we fail to see how the jury's awareness of a prior hearing has any bearing on the jury's verdict. Therefore, Robinson has failed to establish both deficient performance and prejudice.

{¶ 40} Robinson next contends that his trial counsel was ineffective in failing to continually object to the hearsay testimony of Officer Overholtz. As previously noted, the trial court permitted Overholtz to testify regarding the statements L.D. made to him at the

hospital under the excited utterance hearsay exception. Although Robinson's trial counsel objected to Overholtz's hearsay testimony multiple times, counsel did not object while Overholtz was responding to the follow-up questions discussed under Robinson's second assignment of error. Robinson claims that his trial counsel should have objected to Overholtz's responses to the follow-up questions because an appropriate timeframe of excitement was not established for purposes of applying the excited utterance exception. However, as previously discussed, the context of the record as a whole indicates that the appropriate timeframe was established. The failure to object also did not result in any prejudice to Robinson since L.D.'s testimony describing the incident was substantially similar to Overholtz's hearsay testimony. Therefore, under these circumstances, Robinson has once again failed to establish both deficient performance and prejudice.

{¶ 41} Robinson also contends that his trial counsel was ineffective in failing to object when Officer Overholtz explained his understanding of the phrase "hog-tied" after testifying that L.D. told him Robinson "picked her up after being hog-tied." Trans. p. 263. Overholtz testified that he understood the term "hog-tied" to mean "when your legs and your hands are tied together behind your back where you can't move your limbs." *Id.* Robinson contends that Overholtz's subjective interpretation of "hog-tied" was improper because it was not what the victim relayed to him. We again find no merit to Robinson's claim.

{¶ 42} Because no previous testimony had yet been given on how L.D. was restrained, we find that Overholtz's explanation of "hog-tied" was an admissible clarification. We note that Overholtz did not specifically testify that L.D. was tied up in the manner he described, but simply explained what he understood the term "hog-tied" to

mean. Regardless, L.D. later testified as to how she was restrained, noting that Robinson tied her wrists and ankles during the altercation. Therefore, even if Overholtz's testimony had been improper, no prejudice resulted from trial counsel's failure to object since L.D. later testified as to how she was restrained.

{¶ 43} For his last ineffective assistance claim, Robinson contends that his trial counsel was ineffective in failing to disclose certain evidence to the State, which resulted in the evidence being inadmissible. The evidence at issue was three correspondences that L.D. sent to Robinson while Robinson was in jail awaiting trial. For purposes of the record, the correspondences were marked as Defendant's Exhibits A, B, and C. Exhibit A was a Christmas card containing no relevant information. Exhibit B was a September 2016 letter wherein L.D. wrote: "I'm so sorry Kendrick!!! My lies are f**ked up[.]" Exhibit C was a January 2017 letter wherein L.D. wrote: "I want to know how you truly feel about Shannon & that baby…but I will never know…I truly wish her & that baby wasn't here...if you know what I mean * * * I would really kill her if I had the chance[.]"

{¶ 44} A review of the record reveals that the parties agreed the content of Exhibit A was irrelevant to the case. As for Exhibit B, Robinson's counsel advised the trial court that he had intended on using the exhibit as a prior inconsistent statement, but conceded that the exhibit lost its material value when L.D. testified to lying about Robinson raping her. Although Robinson's trial counsel attempted to admit Exhibit C for purposes of showing that L.D. had violent tendencies, the trial court excluded it from evidence because it contained inadmissible hearsay. Therefore, Robinson's claim that these exhibits were not admitted into evidence because of his trial counsel's failure to disclose them is not supported by the record. Robinson's ineffective assistance claim asserting

otherwise lacks merit.

{¶ 45} Having found no merit to any of Robinson's ineffective assistance claims, his first assignment of error is overruled.

**Third Assignment of Error**

{¶ 46} Under his third assignment of error, Robinson contends that the State presented insufficient evidence to support his conviction for two counts of felonious assault under R.C. 2903.11(A)(1) and (A)(2). We disagree.

{¶ 47} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 48} As previously noted, Robinson was convicted for two counts of felonious assault, one count under R.C. 2903.11(A)(1), and the other count under R.C. 2903.11(A)(2). Under section (A)(1) of the statute, a person commits felonious assault when he or she "knowingly * * * [c]ause[s] serious physical harm to another[.]" R.C.

2903.11(A)(1).   On the other hand, under section (A)(2) of the statute, a person commits felonious assault when he or she "knowingly * * * [c]ause[s] or attempt[s] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."   R.C. 2903.11(A)(2).

{¶ 49} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.   A person has knowledge of circumstances when the person is aware that such circumstances probably exist."   R.C. 2901.22(B).   " 'Additionally, a defendant acts knowingly, when, although not intending the result, he or she is nevertheless aware that the result will probably occur.' "   *State v. Mpanurwa*, 2017-Ohio-8911, 102 N.E.3d 66, ¶ 11 (2d Dist.), quoting *State v. Anderson*, 10th Dist. Franklin No. 10AP-302, 2010-Ohio-5561, ¶ 13. (Other citation omitted.)   "Thus, 'felonious assault under R.C. 2903.11(A), combined with the definition of "knowingly" found in R.C. 2901.22(B), does not require that a defendant intend to cause "serious physical harm," but that the defendant acts with an awareness that the conduct probably will cause such harm.' "   *Id.*, quoting *Anderson* at ¶ 13; *State v. Gray*, 2d Dist. Montgomery No. 26139, 2016-Ohio-1419, ¶ 41.

*R.C. 2903.11(A)(1) - Serious Physical Harm*

{¶ 50} The definition of "serious physical harm" includes "[a]ny physical harm that involves * * * some temporary, substantial incapacity; * * * some temporary, serious disfigurement; * * * [or] acute pain of such duration as to result in substantial suffering or that involves any degree of prolong or intractable pain."   R.C. 2901.01(A)(5)(c)-(e). " 'The degree of harm that rises to the level of "serious" physical harm is not an exact

science, particularly when the definition includes such terms as "substantial," "temporary," "acute," and "prolonged." ' " *State v. Bootes*, 2d Dist. Montgomery No. 23712, 2011-Ohio-874, ¶ 19, quoting *State v. Irwin*, 7th Dist. Mahoning No. 06 MA 20, 2007-Ohio-4996, ¶ 37.

{¶ 51} "Under certain circumstances, a bruise can constitute serious physical harm because a bruise may satisfy the statutory requirement for temporary serious disfigurement." *Id.*, citing *State v. Worrell*, 10th Dist. Franklin No. 04AP-410, 2005-Ohio-1521, ¶ 47-51, *rev'd on other grounds*, *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174. Photographic evidence of severe swelling and bruising in and around the victim's eye has been held sufficient to constitute temporary serious disfigurement for purposes of establishing serious physical harm. *State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 38, citing *State v. Plemmons-Greene*, 8th Dist. Cuyahoga No. 92267, 2010-Ohio-655, ¶ 29 (photograph of black eye, swelling, and bruising, in conjunction with testimony, sufficient for a finding of "serious physical harm").

{¶ 52} In this case, when Robinson testified at trial, he admitted to having a physical altercation with L.D. and to punching L.D. in the face. L.D. testified that Robinson hit her multiple times in the face and all over her body. L.D. also testified that Robinson used electronic cords to tie her wrists and ankles. L.D. further claimed that Robinson picked her up and threw her down on the ground while she was restrained. L.D. also recalled Robinson stomping on her face with his foot and choking her with his hands.

{¶ 53} The emergency room physician who examined L.D. after the altercation

testified that L.D. had no broken bones, but that she had swelling and bruises to both eyes, hematomas on her scalp, chemical burns around her lips, and tenderness to her face, abdomen, and back. The physician also testified that L.D. had ligature marks around her ankles and wrists and diffuse bruising on all of her extremities and her chest wall. The physician further noted that L.D. did not want to talk because she was in so much pain and that L.D. was admitted to the hospital because of her injuries. The evidence establishes that L.D. remained at the hospital for over 24 hours.

{¶ 54} In addition, the sexual assault nurse examiner ("SANE nurse") who examined L.D. testified that L.D. had "extensive facial trauma." Trans. p. 370. The SANE nurse also testified that L.D. could barely open her right eye and that she was in a lot of pain. The SANE nurse further testified that L.D. had multiple injuries to her arms, hands, hips, chest, and neck. When conducting an anal exam, the SANE nurse discovered redness around the entire circumference of L.D.'s anal opening. The nurse testified that the redness was indicative of trauma.

{¶ 55} Photographs of L.D.'s injuries taken on the night of the altercation depicted severe bruising to L.D.'s right eye, which was swollen shut. The photographs also showed slightly less severe bruising and swelling to L.D.'s left eye. Officer Overholtz testified that L.D. was unable to provide a written statement because of her eyes being swollen. The photographs also establish that L.D. had swollen, bloodied lips and severe bruising and red marks all over her body. Additional photographs taken by an investigating detective on the afternoon of August 23, 2016, showed that L.D.'s face and body were still severely bruised over 24 hours after the incident.

{¶ 56} The aforementioned testimony and evidence sufficiently demonstrate that

L.D. suffered temporary, serious disfigurement as a result of Robinson assaulting her. Therefore, we conclude that there was sufficient evidence for the jury to find that Robinson knowingly caused L.D. serious physical harm in violation of R.C. 2903.11(A)(1).

*R.C. 2903.11(A)(2) - Physical Harm with a Deadly Weapon*

{¶ 57} The definition of "physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). " '[A]n "attempt" to cause physical harm with a deadly weapon is sufficient to constitute felonious assault under R.C. 2903.11(A)(2).' " *State v. Smith*, 4th Dist. Pickaway No. 06CA7, 2007-Ohio-502, ¶ 42, quoting *State v. Standberry*, 8th Dist. Cuyahoga No. 69079, 1996 WL 65875, *3 (Feb. 15, 1996). (Other citations omitted.) Therefore, "actual physical harm is not a necessary element of felonious assault." *Id.*, citing R.C. 2903.11(A)(2).

{¶ 58} The definition of "deadly weapon" is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). As we noted in *State v. Berry*, 2d Dist. Montgomery No. 21037, 2006-Ohio-833:

"The definition of deadly weapon in R.C. § 2923.11(A) imposes two requirements of proof. First, the article must be capable of inflicting death. Second, the article must either (1) have been designed or specially adapted for use as a weapon or (2) possessed, carried, or used as a weapon. Either alternative branch of the second requirement can be employed to prove the proposition. When use is a factor, the manner of its use and the nature of the instrument itself determines its capacity to inflict death."

*Id.* at ¶ 10, quoting *State v. Schooler*, 2d Dist. Montgomery No. 19627, 2003-Ohio-6248, ¶ 21.

**{¶ 59}** In *Berry*, we held that a jury could have found that the defendant used a five-inch-blade knife as a deadly weapon where there was evidence establishing that the defendant had "opened the blade and slashed, poked, or lunged at the [the victim] with it." *Id.* at ¶ 11. In so holding, we noted that "the jury reasonably could have found that [the defendant] attempted to cause physical harm with the knife[.]" *Id.* at ¶ 12.

**{¶ 60}** In this case, L.D. testified that Robinson pulled out a knife and touched parts of her body with the knife. Under the excited utterance hearsay exception, Officer Overholtz testified that L.D. told him Robinson used the knife to poke her vagina and nose and that Robinson told L.D. to sit on the knife while he was holding it up to his groin. Photographs of the bedroom where the assault occurred also show a knife lying on a nightstand. *See* State's Exhibit Nos. 13, 63, and 64. The photographs also depict a box of knives underneath the nightstand. *See* State's Exhibit Nos. 61 and 62. Although the blade of the knife shown lying on the nightstand appears smaller than the knife described in *Berry*, reasonable minds could nevertheless conclude that the knife was capable of inflicting death and that it was used as a weapon by Robinson. Therefore, when considering the evidence in a light most favorable to the State, we conclude that there was sufficient evidence for the jury to find that Robinson knowingly attempted to cause physical harm to L.D. with a deadly weapon in violation of R.C. 2903.11(A)(2).

**{¶ 61}** Robinson's third assignment of error is overruled.

**Conclusion**

{¶ 62} Having overruled all three assignments of error raised by Robinson, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Charles W. Slicer III
Hon. Gregory F. Singer